T.C. Memo. 2011-138

UNITED STATES TAX COURT

DALLAS ERIC GRAVETTE, SR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7260-09L.                    Filed June 21, 2011.

Dallas Eric Gravette, Sr., pro se.

<u>Kimberly L. Clark</u> and <u>John D. Davis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioner, Dallas Gravette, Sr.,
failed to pay his income-tax liabilities for 2003 and 2004.  In
order to collect the liabilities, the IRS Office of Appeals
determined that the IRS should levy on Mr. Gravette's assets.
Under section 6330(d) of the Internal Revenue Code, Gravette

challenges the determination of the Office of Appeals.[1]  We sustain the determination.

FINDINGS OF FACT

The IRS sent a notice of intent to levy and notice of right to hearing to Gravette.  This notice consisted of one page-- according to the stipulation of the parties.  But the stipulated page fails to state what type of tax the levy was intended to collect, the amount of tax, or the tax periods involved.  We surmise from other portions of the record that the notice was two pages rather than one and that the second page of the notice stated that the purpose of the levy was to collect Gravette's unpaid income-tax liabilities for 2003 and 2004.  On March 11, 2008, Gravette requested a collection-review hearing.  In the request, he said he challenged the IRS levy to collect his income-tax liabilities for tax years 1999 through 2007.  His request was made within the requisite 30 days of the levy notice.  See sec. 6330(a)(3)(B) (giving 30-day requirement).  Thus, the request was a timely appeal of the IRS proposal to levy to collect Gravette's tax liabilities for 2003 and 2004.[2]  In his

---

[1]All references to sections are to sections of the Internal Revenue Code, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

[2]On Apr. 25, 2008, the IRS wrote Gravette to tell him that the IRS had not issued a notice of intent to levy for the other years and that therefore he did not have a right to an administrative hearing to contest levies for those years.

request, Gravette stated that he lived at an address in the District of Columbia.

On April 7, 2008, Gravette signed a one-year lease on a house in the District of Columbia. The house was at the address that was listed on his request for a hearing. His fiancé, Shonna White, signed the lease as a cotenant. The two were required to pay rent of $725 per month. The record does not reflect how they shared the responsibility for the monthly rent payment. The term of the lease was from April 11, 2008, to April 10, 2009. The lease agreement was eventually made a part of the administrative record, meaning the set of documents that was considered by the Office of Appeals when it sustained the levy.

Deborah Douglas of the IRS Office of Appeals was assigned to handle Gravette's collection-review hearing. On May 22, 2008, she wrote a letter to Gravette notifying him that on May 6, 2008, the Office of Appeals had received his case.

Gravette submitted to Douglas an IRS Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. He also submitted supporting documentation. The Form 433-A, which was dated June 8, 2008, stated that Gravette lived at the same address in the District of Columbia that appeared on the lease that we discussed above. Gravette stated on the Form 433-A that the date of the lease was April 11,

2008, the date of final payment was April 11, 2009, and the amount of the monthly payment was $725. The Form 433-A contained a blank for Gravette to enter his monthly expenses for housing and utilities. Although the preprinted words stated that the housing and utilities expense includes rent, mortgage payments, and utilities, Gravette mistakenly listed only $265, which was his estimate of his monthly utilities expense in the District of Columbia. Gravette listed $830 per month on a blank for court-ordered payments.

Gravette submitted another Form 433-A, which, like the first Form 433-A, had a date of June 8, 2008. The preprinted words on the second Form 433-A were different from those on the first Form 433-A in at least one relevant respect. Unlike the first Form 433-A, the second form did not require the taxpayer to state specific facts regarding real property rented by the taxpayer, such as the date of the lease, the date of the final rent payment, and the amount of the monthly rent payment. On the second Form 433-A, Gravette stated that the housing and utilities expense was $990. He did not explain how the $990 was calculated; we surmise that $990 was the sum of the utilities expense of $265 and a monthly rent of $725. Gravette again listed $830 per month in court-ordered payments. The trial record does not explain why Gravette prepared the second Form

433-A. The second Form 433-A was in the administrative record that was eventually considered by the Office of Appeals.

Another document in the administrative record is a June 18, 2008 report of Gravette's history of making child support payments. The report showed that Gravette was required by court order to make payments of only $630 per month. The report showed that the actual payments that Gravette had made over the last five months amounted to $740.42 per month. The report also showed that Gravette owed over $20,000 in back child support.

On July 8, 2008, Gravette completed a Form 656, Offer in Compromise. He proposed to pay $75 per month for 120 months. He stated that his offer would compromise his income tax liabilities for 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006. The basis for the offer was doubt that the IRS could collect the tax liabilities.

On July 15, 2008, Deborah Douglas had a telephone conference with Gravette as part of the collection-review hearing. Before the telephone conference, Douglas decided that Gravette's offer-in-compromise should be reviewed by "BOIC" and that if the offer-in-compromise was recommended for rejection, the Office of Appeals would consider the offer.[3]

---

[3]BOIC is apparently a reference to a centralized IRS unit for evaluating offers-in-compromise.

In August 2008 Gravette moved from the District of Columbia to Boise, Idaho.  He and White signed a one-year lease on a house in Boise for $560 per month.

On November 18, 2008, Stephanie Gage, an IRS Offer Examiner, wrote a letter to Gravette[4] stating:

> We have investigated your offer dated 07/08/2008 in the amount of $9000. * * *
>
> We have made a preliminary decision to reject your offer for the following reason(s):
>
> Your monthly income exceeds your expenses.
>
> The decision to reject your offer is a preliminary decision made by Collection personnel.  Due to the fact that you have filed a request for a Collection Due Process (CDP) hearing, we are forwarding your case to Appeals.  A final determination on the offer will be issued by Appeals in conjunction with the CDP case.

We surmise that Gage relied on monthly income and expense estimates when considering the offer, that the estimates assumed that Gravette's housing and utilities expense was $265 per month, and that Gravette was informed of these estimates.

On December 11, 2008, Gravette wrote Gage that "I received your letter dated November 18, 08, rejecting my Offer in Compromise."  He continued:  "I have enclosed IRS Form 13711 with this letter indicating my request for appeal of this matter."  He stated:  "As you will see by the attached lease, my housing costs are much higher than $256.00, without adding the utility costs

---

[4]The record does not show the address to which Gage's letter was sent.

associated with daily living."[5]  Attached to the letter was a

lease for the house in Boise.  The lease required Gravette and

White, as cotenants, to pay $560 per month.  The term of the

lease was August 9, 2008, to September 1, 2009.  The return

address of the letter was the Boise address that was on the

lease.  Attached to the letter was a Form 13711, Request for

Appeal of Offer in Compromise, dated December 11, 2008.  On the

Form 13711, Gravette stated that he disagreed with "IET

[Income/Expense Table] - Housing and Utilities Costs" for the

following reason:

> My monthly rent and utilities are much higher than the
> amount allowed.
> * Copy of current lease attached.[6]

On January 7, 2009, Deborah Douglas sent a letter to

Gravette at his address in the District of Columbia acknowledging

that she had received his appeal of the rejection of his offer to

pay $9,000 to compromise income tax liabilities for 1999, 2003,

2004, and 2006.[7]  The letter stated that Gravette had not filed a

Form 1040 for 2007 and that Gravette needed to file that return

---

[5]Gravette probably meant $265.00, not $256.00.

[6]The Form 13711 did not state any disagreement regarding court-ordered payments.  It is unclear what estimate of court-ordered payments Gage relied on when she considered Gravette's July 8, 2008, offer-in-compromise.

[7]The record does not reveal why Douglas did not consider Gravette's offer-in-compromise to cover 2000, 2001, 2002, or 2005.

and pay any taxes due by January 21, 2009, for the offer-in-compromise to be considered.

On January 15, 2009, Gravette sent Douglas a copy of his 2007 income-tax return filed on that date. The return reported wages of $51,658 and business income of $2,696. The return claimed that Gravette was due a refund. The address on the tax return was the Boise address.

On January 28 or 29, 2009, Deborah Douglas sent a letter to Gravette at the Boise address. In the letter, Douglas stated that "Centralized Offer in Compromise" had made a preliminary determination to reject Gravette's offer-in-compromise. Douglas stated that the offer-in-compromise had been forwarded to "this office" (that is, the Office of Appeals) for review of Gravette's offer of $9,000 to compromise total tax liabilities of $22,881.38 for the tax years 1999, 2003, 2004, and 2006. The letter enclosed an Asset/Equity table and an Income/Expense table that had been calculated by "Compliance". The Income/Expense table calculated that Gravette would be able to pay the IRS $1,415.25 per month starting on January 1, 2009. The table showed that in 16 months Gravette would pay off his liabilities, which comprised $4,937.04 for 2004, $7,632.97 for 2003, and $9,183.16 for 1999.[8] The table also showed that over his lifetime Gravette would be capable of paying the IRS a total of $152,847. In calculating

---

[8]The table did not show a liability for 2006.

that Gravette could pay $1,415.25 per month to the IRS, the table assumed that Gravette would pay only $265 per month for "Housing and Utili". The table also reflected that court-ordered payments were $740.42. Douglas asked Gravette to respond to the letter by February 6, 2009. Gravette did not respond, as far as we can tell from the record.

On February 24, 2009, the Office of Appeals determined that relief would not be granted from the notice of intent to levy to collect the 2003 and 2004 liabilities. The determination stated that the reasonable collection potential--that is, the amount the IRS could collect from Gravette--was $34,250. The determination stated that total net equity from Gravette's assets was $1,213.79. Gravette's monthly disposable income was determined to be $688.25. A future income multiplier of 48 months was used, resulting in future disposable income of $33,036. An income and expense table showed how the $688.25 monthly disposable income was calculated:

| Income | Amount Claimed | Amount Allowed |
|---|---|---|
| Gross wages--primary TP | [Blank][1] | $3,766.00 |
| Total income | [Blank] | 3,766.00 |
| Expenses | | |
| National Standard | $400 | 1,151.00 |
| Housing and utilities | 265 | 265.00 |
| Transportation-- ownership costs- vehicle 1 | 145 | [Blank] |
| Transportation-- ownership costs- | 60 | [Blank] |
| Transportation-- operating costs | 20 | 60.00 |
| Additional operating costs--(age/mileage) | [Blank] | 200.00 |
| Health care--insurance | [Blank] | 57.00 |
| Taxes (income and FICA) | [Blank] | 561.33 |
| Court-ordered payments | 830 | 740.42 |
| Public transportation unreimbursed business | [Blank] | 43.00 |
| Total expenses | 1,720 | 3,077.75 |
| Monthly disposable income | -1,720 | 688.25 |

[1]The reason the IRS made no entry here and directly below may be that on the first Form 433-A, Gravette did not enter wages or total income. On the second Form 433-A, Gravette entered $3,764.82 for wages and $3,764.82 for total income.

The reasonable collection potential was calculated by adding $33,036 and $1,213.79. On the basis of this estimate of reasonable collection potential, $34,250, the Office of Appeals determined that Gravette could pay his tax liabilities in full within the "Collection Expiration Statute Date". The total amount of Gravette's tax liabilities was not stated in the determination. The determination stated that "An Offer in

Compromise can not be recommended." The determination stated: "You indicated you are unable to make monthly Installment Agreement payments." The determination stated that Gravette did not dispute his liabilities.

Gravette filed a petition with the Tax Court to challenge the notice of determination. At the time he was a resident of Boise, Idaho. Gravette argues that Appeals made two major errors. First, Gravette argues that Appeals should not have determined that his housing and utilities expense was $265. His rent alone was $725, he claims. Second, Gravette argues that the IRS erred in determining that his child-support payments were only $740.42 per month. The correct number, he alleges, was $830.

## OPINION

Before the IRS can collect tax liabilities by levy, it must offer the taxpayer a hearing with the IRS Office of Appeals. Sec. 6330(a)(1). Among the issues that may be raised by the taxpayer at the Office of Appeals are "offers of collection alternatives" such as offers-in-compromise. Sec. 6330(c)(2)(A)(iii). In reviewing a rejection of an offer-in-compromise, the Tax Court decides whether the rejection was arbitrary, capricious, or without sound basis in fact or law and therefore an abuse of discretion. Murphy v. Commissioner, 125 T.C. 301, 320 (2005), affd. 469 F.3d 27, 32 (1st Cir. 2006).

Section 7122(a) authorizes the IRS to compromise civil tax cases. In general, the decision to accept or reject an offer, as well as the terms and conditions agreed to, are left to the discretion of the IRS. Sec. 301.7122-1(c)(1), Proced. & Admin. Regs. However, section 301.7122-1(f)(3), Proced. & Admin. Regs., provides "No offer to compromise may be rejected solely on the basis of the amount of the offer without evaluating that offer under the provisions of this section and the Secretary's policies and procedures regarding the compromise of cases." The three possible grounds for accepting a compromise of a tax liability are doubt as to liability, doubt as to collectibility, and promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Gravette attempted to justify his offer-in-compromise on doubt as to collectibility. Doubt as to collectibility "exists in any case where the taxpayer's assets and income are less than the full amount of the liability." Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. The IRS will generally compromise a liability on the basis of doubt as to collectibility only if the liability exceeds the taxpayer's reasonable collection potential. Reasonable collection potential is "that amount, less than the full liability, that the IRS could collect through means such as administrative and judicial collection remedies". Murphy v. Commissioner, supra at 309.

The Office of Appeals did not abuse its discretion in evaluating Gravette's offer. The administrative record showed that Gravette had an ongoing child-support obligation of $630 per month. Gravette also had a substantial arrearage of child support payments. The total amount of the arrearage was reflected on the child-support report that he submitted to Appeals. On June 25, 2010, the state court ordered Gravette to pay $200 per month in back child support. But this court order did not exist at the time the Office of Appeals determined to sustain the proposed levy, and therefore the order cannot serve as a basis for challenging the determination of the Office of Appeals. The Office of Appeals did not err in concluding that Gravette's child support obligation was $740.42 per month.[9]

The Office of Appeals calculated that Gravette's housing and utilities expense was $265 per month. Gravette argues that the Office of Appeals erred by not accepting his estimate of $990, which was equal to his $725 rent (in the District of Columbia) and his $265 estimate of utilities (in the District of Columbia). We can see why the $990 estimate was not accepted by the Office of Appeals. The Forms 433-A were submitted by Gravette when he lived in the District of Columbia. Gravette moved to Boise in August 2008. Thus, the Forms 433-A were outdated by the time of

---

[9]The $740.42 amount was equal to the child-support payments that Gravette had made during the last 5 months covered by the child-support report, divided by 5.

the determination.  In addition, the Forms 433-A were confusing even as an attempt to show Gravette's housing and utilities expense when he lived in the District of Columbia.  The first Form 433-A listed his housing and utilities expense as only $265, even though his rent was $725.  The second Form 433-A did not completely resolve the confusion.  The Form 433-A listed his housing and utilities expense as $990, apparently the sum of $265 and $725.  Although this $990 estimate was substantiated by copies of Gravette's utilities bills and by the $725 per month lease, Gravette did not explain how much of the $725 rent was his responsibility and how much was White's.  After Gravette moved to Boise, he submitted to the IRS his Boise lease, which showed a rent obligation of $560.  But the Boise lease, like the District of Columbia lease, showed that Gravette had a cotenant (White).  Gravette did not explain how he and White allocated the rent responsibility.  Furthermore, Gravette failed to estimate his utilities expense in Boise.  He notified the IRS only that his Boise housing and utilities expense was "much higher" than $265, meaning that the sum of his Boise rent and his Boise utilities expense was greater than his District of Columbia utilities expense.  How much greater he did not say.  When the Office of Appeals sent Gravette a table estimating that Gravette's housing and utilities expense was $265 per month, this was Gravette's opportunity to explain what his rent and utilities expense in

Boise was. He did not do so. In the light of his lack of response, the Office of Appeals did not err in using $265 as the estimate.

Gravette contends that the Office of Appeals erred in other ways. He argues that the Office of Appeals erred in calculating his monthly income because it failed to consider that, because of the sporadic nature of his work, he was unemployed several months out of the year. But the Office's estimates of Gravette's monthly income were based on monthly averages of Gravette's yearly income. This yearly data took into account the monthly variations in Gravette's income. Next Gravette argues that Douglas had "prior involvement" in his case because Douglas worked on Gravette's case file for more than two months, from the time she received the case until the telephone conference on July 15, 2008. This is not a "prior involvement" prohibited by the statute. See sec. 301.6330-1(d)(2), Q&A-D4, Proced. & Admin. Regs. (defining prior involvement as involvement in a matter other than a CDP hearing). Gravette also argues that he raised the matter of his underlying tax liabilities at the administrative hearing. We disagree. Although Gravette told the Office of Appeals that he was unable to pay his tax because his employer failed to withhold income tax from his wages, it was not

apparent that this was a challenge to the amounts of his income tax liabilities.  The Office of Appeals' determination to sustain the proposed levy was not an abuse of discretion.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.